sender, joined in the fun themselves by putting it into still *another* envelope, addressing it to Cunningham, **applying adequate first class-postage and depositing same in the U.S. Mail,** completing the **loop between** (Weissman Nowack and Jenny Pruitt) **coconspirators** in order to throw it back in Cunningham's face, letting him know that under *no* circumstances and by ***no one in their criminal network*** would he be allowed to be successful in contacting the Whiteners (yet another **layer** designed for the **protection of** the individuals and entities making up the aforementioned **criminal enterprise** referred to in 1.6.3).

1.16 In April of 2004, Cunningham had been informed through a third party that some of the adjacent property listings held by Hayes and Remax, referred to in 1.3 of this Complaint, may be available.

1.16.1 It was further discovered by Cunningham through conversations with the third party (as well as the actual property owners) that during the period of time Hayes and Remax had the ***active*** listing contracts on these properties is when they also entered into the Buyer's Broker Agreement with Cunningham that affected these properties. Hayes and Remax had **fraudulently not disclosed** to any of the affected property owners that they (Hayes/Remax) had also **entered into an agreement** concerning their property with Cunningham, nor that Cunningham was a potential client that was extremely interested in purchasing their

property (information Hayes and Remax **are bound by law to disclose** to their clients). Hayes and Remax had a party (Cunningham) interested in making a purchase offer on the property owners' listings, and they (Hayes and Remax) not only **refused to inform** the property owners they represented of such, but also **refused to inform** the owners that they (Hayes and Remax) had **entered into a contract** to represent this interested party (Cunningham) ***in the purchase of their*** **(the owners)** ***listed properties***.

1.16.2 The **level of complexity** to Hayes and Remax's **scheme** and the **ease** at which they **operate** it not only boggles the mind by its **utter** and **unrepentant** degree of **illegality**, but additionally belies the very **level of experience**, undoubtably due to **repeated practice and execution** of such, necessary to make it run so ***smoothly*** **and** ***successfully***.

1.16.3 To intentionally keep Cunningham and the owners apart (while having the desired effect of **interfering** with Cunningham) would at first blush appear nonsensical and self defeating, as it would seemingly take money from Hayes' pocket. It makes sense that there is another **"J. Doe"** individual or entity (which Hayes has determined is more profitable to her) **waiting in the wings** for Hayes to **drive Cunningham out** of the Whitener deal, at which time these **coconspirators** can combine all the parcels together.

1.16.4 **Hayes has previously informed Cunningham that a plan for such a combination of all the separate, adjoining parcels is promoted, and would be well received, by the City of Smyrna, and that the City had approached her and others who controlled the contiguous properties, suggesting they work together and market their properties as one, to preferably one Buyer entity** (giving Cunningham this information was a major slip by Hayes, as she most certainly had not included him in any such all inclusive marketing effort). **To date, Hayes has not made effort to bring Cunningham *one single property* - not the ones agreed to that she listed and not any of those contiguous, as they had also agreed she would.**

**Considering the fact that Cunningham's intention to combine the contiguous properties was exactly the same (unknown to him at the time) suggested to Hayes by the City, and that Cunningham had hired Hayes to perform just that task for *him*, it speaks volumes of Hayes and Remax's actual intentions and their desire to force Cunningham out of the deal in favor of some other individual or entity.**

1.16.5 Such a combination would certainly make for a much more cohesive mesh with the newly developed downtown area (as opposed to smaller, individually developed pieces), from the City's viewpoint.

1.16.6 Through the third party, Cunningham arranges to meet with a few property owners whose listing agreements with Hayes /Remax have expired, and on May 2nd and May 6th, 2004 is successful in putting two of these properties under contract.

1.16.7 In the course of performing these two contracts, Cunningham is informed by the third party that Hayes has gone to the neighborhood in an effort to re-sign the property owners whose listing agreements had run out, and to sign them to sales contracts as well.

1.16.8 The third party further informs Cunningham she had heard that "**Elaine Hayes was badmouthing you** (Cunningham) all over the neighborhood (Cunningham had this rumor confirmed by one of the property owners he had a contract with during a meeting in late September or early October, 2004), and telling them (the property owners) that the contracts with Cunningham were no good, because he has not been down here to talk to you lately".

1.16.9 Cunningham was actually in the end phase of **performing** the contracts, which were **still active**. The lender had issued approval on the two properties under contract, and also on an additional property Cunningham was told, by the third party, would also sell to him. Scheduling appraisals and closings were all that was left when Hayes and Remax stole at least one contract out from under

Cunningham.

1.16.10 Hayes and Remax on behalf of an unknown "**J. Doe"** entity or individual, (assumably again as Buyer's Broker), **fraudulently** and **tortiously induced** property owner(s) to sign a new sales contract with them while they knew the properties were under contract with Cunningham, also **defaming** Cunningham as they went.

1.16.11 Had Hayes, Remax and their J. Doe accomplice truly felt the status of Cunningham's contracts was in question, there were **adequate legal avenues** available they could have recommended to the individuals who were party to the contracts to pursue in attempt of dissolution. Under absolutely no circumstances did Hayes, Remax and their J. Doe coconspirator have the right to "**rule down from above**" on such matters themselves, and even further, to **browbeat** the unwitting property owner(s) into becoming **participants** in such **scurrilous, actionable behavior**.

1.16.12 It was not enough for Hayes and Remax to "only" **interfere with** Cunningham's **business relations** and **contracts,** but it was also necessary to cause Cunningham to **suffer** as much **emotional distress** as they could put upon him. Hayes' **actionable, reckless, defamatory conduct** of apparently going door to door **besmirching** Cunningham's **character and reputation,** both personally and

professionally, combined with the **continuous, tortious interference** with Cunningham's **contracts** and **business relations** [not to mention exposing the unwitting property owners (that they **conned** into **violating** the contract with Cunningham) to **litigation]**, have taken, and continue to take a **severe emotional toll** on Cunningham.

1.16.13 Around the last week in September or the first week in October, Cunningham was driving past the home which Hayes had convinced the owner to abandon his contract with Cunningham. The gentleman noticed Cunningham and spoke to him. Cunningham was informed by this property owner (with whom Cunningham had a purchase contract) that he had, indeed, been **convinced by Hayes to ignore his contract** with Cunningham. He also stated that **Hayes** had indeed been "**badmouthing**" Cunningham to him. Apparently in the course of convincing him to sign with her, Hayes had made reference to particular "legal difficulties or situations" concerning the gentleman's family. What Hayes' purpose was for making the property owner aware that **she was knowledgeable of these personal, family legal affairs** was not discussed between Cunningham and the property owner, but Cunningham went away from that meeting with the understanding that the inference was that Hayes was **using her information to** help "convince" the property owner to **ignore his contract** with Cunningham and re-sign

with Remax.

1.16.14 This may also explain why the property owner "jumped" at the chance (as was related to Cunningham by the third party) to sign a new contract with Remax for only $100,000 where the contract with Cunningham was for $125,000 ***($25,000 less!).***

1.17 In the second week of October 2004 Cunningham received a voicemail from Scott Cochran. This message was to inform Cunningham that Cochran's firm was *now* representing the Whiteners in their contract with Cunningham.

1.17.1 On October 15, 2004 Cunningham sent Cochran a certified letter, which was signed for by the firm on October 18. In this letter, Cunningham informed Cochran that while he was pleased to hear that someone may *finally* be owning up to Cunningham to actually representing the Whiteners in this matter, he had gotten nothing but "misinformation" (to paraphrase) from their side, and as a result would have to insist on being provided written proof of such representation, from Murriel and Shawn Whitener, before he would feel comfortable conversing with Cochran on this matter.

1.17.2 A seemingly simple and completely understandable and legitimate request.

1.17.3 However, as of November 22nd 2004, a full ***five weeks*** later, Cunningham has received no notice from the Whiteners (or anyone else for that matter) that Cochran or anyone else represents them, or that they are representing themselves, either.

1.17.4 The Whiteners refuse to put *anything* in writing, they wish to be accountable for *nothing*.

1.18 Due to the individual and collective **conspiratorial efforts** of the **members of** (as well as those simply **aiding and abetting**) the **criminal enterprise(s) engaging in racketeering**, Cunningham has been **further damaged**, and his project **put in** even greater **jeopardy**. At least one aspect of the property "being a first" for the area has recently been **lost to a competitor**. A strikingly similar project has been approved and is receiving great amounts of publicity and exposure through the local media outlets. It is being billed as "the first of its kind in Cobb County", and is a scant 2-3 miles from Cunningham's proposed project.

1.18.1 While waiting for the Whiteners to perform their part of the contract, Cunningham went forward with a part of his contract he was not yet required to perform. He did so as his only interest has been to bring the contract to closing as soon as possible.

1.18.2 Cunningham took the conceptual renderings and the very plan

(inclusive of most all details) of the project itself to meetings with members of the City of Smyrna's Community Development staff, with members of the City Council, and with the Mayor. He provided them copies, effectively making the details of the project public.

1.18.3 If only Cunningham had any way of knowing that others would **interfere** and **cause** such significant, **intentional delays** in bringing the project before the City for planning and zoning approval, he would not have made it public at that time. The very nature of this business is to get your project out there before the other guy has a chance to take your idea and implement it first. The additional complexities of market saturation as well as other adverse effects that are rendered upon such a project by delays in getting it into the market will be further delved into in future filings.

1.18.4 Cunningham further is informed of how another, somewhat similar project (within an *extremely* close proximity to his project's planned location) has suddenly taken on aspects that are strikingly similar to those of Cunningham's project which were previously not incorporated. The planned number of units of this other project apparently have increased (by more than double) in direct proportion to the number of units not built if Cunningham's project is killed.

1.19 The **actionable conduct** of the above named defendants (individually

and collectively as being **members of**, and/or **aiding and abetting the criminal enterprise(s) engaged in racketeering)** has had one consistent, **common, criminal thread**. That being to **interfere** with Cunningham's **contracts**, to **interfere** with Cunningham's **ability to conduct** his **business** and secure **contracts** on additional properties and cause Cunningham as great a level of **severe emotional distress** as possible in **causing** his **complete ruination**.

1.19.1 The intended result is **to prevent** Cunningham from bringing his project to fruition, and **causally destroy** any present and future **business opportunities (**such a project would have led to), as well as to cause Cunningham to drain all available resources while promoting and pursuing his project, consequently being forced to weather the repeated delays.

1.19.2 The actionable conduct of Defendants has caused Plaintiff to spend money unnecessarily and has additionally prevented Plaintiff from creating income by means of the *very property he now holds*, by restricting his ability to determine uses for such.

1.19.3 Whether to subdivide and sell, subdivide, build out and sell, or simply to sell as is (all based on the start time of the project at hand), cannot be adequately addressed by Plaintiff because of **Defendants actions, which have caused (and intentionally so) an extremely heavy, undeserved, financial burden**

**to be placed upon Plaintiff.**

1.19.4 These decisions are further hindered by Sams Larkin's refusal to advise (even though paid for in advance) Cunningham on his re-zoning options relating to each of these properties.

1.19.5 It is impossible to conceive of Hayes, Thomas and Remax operating in such a flagrant, seemingly **unchecked, criminal manner** without the **blessings and promotion** of those higher up in their **network**, Remax of Georgia and Remax International. It can only be concluded that Remax International and Remax of Georgia **share culpability** for the actions of representatives of their network, that particularly being the **actionable conduct** of Hayes and Remax specifically, and the similar, actionable conduct of other such representatives of the Remax International Network as it likely is occurring across the United States, and similarly, around the world.

1.19.6 The same applies to Dickerson, Jenny Pruitt and their affiliate companies, Home Services of America, Inc, and Berkshire Hathaway. As with the Remax International Network, these **entities** put themselves forth **as being interconnected**, and answerable up the chain of command. It is also reasonable to conclude that this **unconscionable behavior** being **tolerated/promoted** from above is not limited to Dickerson and this one local Jenny Pruitt office.

1.19.7 The enterprise at the core of this complaint, that of the Whitener's, has made it clear this **actionable behavior** is the **status quo**, and will no doubt reflect in other of their endeavors.

1.19.8 Sadly, the same likely holds true for the three law firms: **Sams, Larkin & Huff, LLP; Weissman, Nowack, Curry & Wilco, PC; Cochran, Camp & Snipes, LLC.**

1.19.9 **It is almost a certainty that particular causes of action within this complaint will qualify to be elevated to class action status in future filings.**

1.19.10 Similar to the "**one consistent, common criminal thread**" referenced in 1.19 of this Complaint, Cunningham cannot help but notice the same reflected in the **actions** of all the "**professionals**" involved. Not unlike the corporate scandals prevalent in the news, it appears there is a **widespread problem** of such **"professionals" running roughshod** over an unsuspecting populace, as inexperience and unwariness allow, and all with an apparent **total lack of accountability to, or restraint by** their respective **professional governing bodies**.

1.19.11 Cunningham has also noticed that this **lack of accountability** is **further exacerbated** by the treatment of such professionals (predominantly those of the **legal profession**) **by the courts**, as it is decidedly

**different** than that of "**ordinary citizens**" who for whatever reason find it necessary to represent themselves ***pro se.***

1.19.12 Plainly, it has been the experience of Cunningham that such professionals have been shown **great undue and uneven deference, in contrast to their *pro se* counterparts, by the courts,** and *prays such will not be the case here.*

1.20 On October 21, 2004, Cunningham sent Weissman Nowack a **demand letter** for a copy of his **complete file**, including **all additions** beyond what Cunningham had provided (notes kept per meetings, phone conversations, etc.).

1.20.1 On November 4, 2004, Weissman Nowack, **by means of the US Mail,** forwarded Cunningham what amounted to an incomplete, entirely **fraudulent** representation of the **file** Cunningham knows Weissman Nowack to possess.

1.20.2 **Noticeably** and coincidentally **missing** were the inclusion of, any notation of, or even the slightest reference to, pretty much **anything** that would **reflect poorly** on the firm's **treatment** of Cunningham. As example:

1.20.3 There was no reference to the phone conversation between Cunningham and Moss where **Moss** dropped the "**Jenny Pruitt Conflict**" bomb on Cunningham.

1.20.4 There was no inclusion as to the **multiple emails** received by

the firm, sent by Cunningham to Seth Weissman, informing him that **problems** had arisen that he and Cunningham **needed to discuss** before being able to **go forward** on the Whitener deal.

1.20.5 Quite obviously, as stated in 1.13.1, the **firm is laying the ground work to "cover their ass".**

1.20.6 Weissman Nowack knows the "Jig" is up, they know that Cunningham intends to **hold them accountable** for their **actionable conduct**, and consequently, they have now proceeded to create a **fraudulent**, completely mis-representative **accounting** of the **record**.

1.20.7 [While being a pro se, "non-lawyer" litigant also means Cunningham may not catch a lot that is improper, he's pretty sure that these actions being taken by Weissman Nowack are ***highly illegal***. Not only in relation to proper treatment of a client, but also concerning their collective responsibilities and **fiduciary duties** as members of the bar as well as being officers of the court.]

1.20.8 On November 8, 2004 Cunningham faxed and sent certified mail a second letter to Seth Weissman concerning the file. Cunningham complained of the file's incompleteness, and demanded a full, accurate accounting from the firm.

1.20.9 As of November 22, 2004, **a full two weeks later**, Weissman Nowack has **refused to cooperate** with Cunningham's **demand**, an action that

seemingly would take an office assistant a mere hour or two to compile and even double check for completeness - no more than one day's effort and *certainly* not more than a week. Still nothing after two weeks is ***criminal***.

1.20.10 Cunningham is not surprised, as Weissman Nowack is engaged in a "scorched earth" campaign of "ass covering". Admitting **possession** of such ***incriminating*****, documentary evidence** would be engaging in (self) "ass nailing", something the firm is not likely to do without external motivation.

1.21 In the entirety of this complaint some remarks in quotations are verbatim and some are paraphrased recollections of written or recorded remarks. In the event of any conflict, such statements made herein will be subordinate to and are intended to be supportive and/or derivative of, the written or recorded record. As such, they are not intended to take the place of or confuse, rather are utilized only to note reference to actual, historical statements made as conversed or written thoughts, as opposed to being thoughts merely conceived but never actually expressed.

1.22 Plaintiff is aware of **actions** in progress that are intended to be **detrimental** to his interests in this matter, including but not limited to an attempt to alter both the **Smyrna Current and Future zoning maps** of the subject property, as well as its status as represented on the **Smyrna Land Use Map**.

1.23 Much of the defendants **unresponsive** behavior and **delay** tactics described in this complaint are for this very reason. The **defendants' goal** is to **deprive Plaintiff** of his **ability to purchase** the properties and move forward with his project. **Delaying Plaintiff** until the property classification is **altered** adequately (and sold to others) fulfills this task, so time is of the essence with the filing of this complaint. Consequently, an ex parte motion for a TRO to maintain (or revert back to if necessary) the status quo of the properties ownership and zoning status as earlier referenced is to immediately follow, and become part of, this complaint.

1.23.1 The **manner** of requesting protection through this motion is proving **problematic** to Plaintiff. There are three classes of properties and land areas to consider.

1.23.2 **First** and foremost, there is the property actually under contract between the Whiteners and Cunningham that Plaintiff certainly deserves maintaining the status quo on.

1.23.3 **Second** are the properties which were listed by Hayes and Remax that Cunningham and Hayes/Remax entered into a Buyer/Broker Agreement over. Due to Defendants' intentional delays, some of these properties have likely been sold. Plaintiff is slow to suggest these sales be reversed due to the undeserved burden placed upon the purchasers, should they be unwitting participants (Plaintiff

feels otherwise should the buyers prove to be J Doe 1 or other such coconspirators), but would ask for an order from the Court holding Defendants liable, both civilly and criminally as warranted, and to compensate Plaintiff for the loss.

1.23.4 **Third** are the remaining, contiguous properties not listed by Hayes/Remax, that were also to be brought to Cunningham by Hayes as per the Buyer Broker Agreement. Plaintiff rightfully feels equally "robbed" of the ability to purchase these properties, but feels it would be a great and unfair burden to place upon the innocent owners or those they have sold to, should they be unwitting participants, by reversing any such sales. However, Plaintiff feels otherwise, and would ask of the Court to reverse any such sales or transfers ultimately found to involve J Doe 1 or other such coconspirators, and additionally to hold Defendants liable, both civilly and criminally as warranted, and compensate Plaintiff for the loss on those sales not reversed. Those properties of this group not yet sold, Plaintiff feels should be protected by maintaining the status quo through this proceeding. As for the remaining properties, if any of the defendants or their coconspirators to this action are ultimately found to have benefitted from such sales or transfers, that Defendants be held liable (as in 1.23.3) for the loss on any and all such properties.

1.23.5 Plaintiff asks the Court to maintain or revert to, as per the Binding Agreement Date (October 22, 2003) of the Buyer/Broker Agreement

between Hayes/Remax and Cunningham, the status quo concerning any broad changes to the City of Smyrna's Current Zoning Map, The Future Land Use Map and the Current Land Use Map, should it be other than the Zoning Map, all relative to the protected properties and the area bounded as listed below in 1.23.6.

1.23.6 The area of the full, contiguous properties is that bordered by: the CSX Railroad tracks behind Jonquil Plaza, running between the East Spring St crossing and the point where the tracks, the southerly dead end of Elizabeth St and the Spring Rd right of way converge; North from that point along Elizabeth St to East Spring St.; West from that intersection along East Spring St to the CSX crossing and point of beginning.

2. **Jurisdiction and Venue**

2.1 This court has jurisdiction under 28 U.S.C. 1331and 1367(A)

2.2 Venue in this district is proper because the letters were sent and received via U.S. Mail in this district; Plaintiffs and Defendants do business and/or reside in this district.

3. **Plaintiff**

**3.1 Plaintiff Cunningham** is an individual who resides at 2766 Stonecreek Rd., Smyrna, Cobb County, GA 30080. Cunningham is the sole stockholder of Smyrna Development Company as well as holding the positions of CEO, CFO, SEC

and is also the registered agent.

4. **Defendants**

4.1 **Defendant Murriel M. Whitener** (M. Whitener) is believed to be a resident of Maine, is the father of Defendant Shawn Whitener (S. Whitener) and is a principal in the following Defendants: Whitener Enterprises, LLC; Whitener Holdings, LLC; Whitener Investment Limited Partnership; Whitener Limited Partnership; Whitener Management and Consulting, LLC; The Whitener Group, Inc.

4.2 **Defendant Shawn Whitener** (S. Whitener) is a resident of Georgia.

4.2.1 S. Whitener is the son of M. Whitener and is a principal in the Defendants as listed in 4.1.

4.3 **Defendant Whitener Limited Partnership** is a Georgia Partnership located at 641 McCready Dr., Dallas, GA 30157.

4.4 **Defendant Whitener Enterprises, LLC** is a Georgia Corporation located at 4340 Floyd Rd., Austell, GA 30106.

4.5 **Defendant Whitener Holdings, LLC** is a Georgia Corporation located at 641 McCready Drive, Dallas, GA 30157.

4.6 **Defendant Whitener Investment Limited Partnership** is a Georgia Partnership located at 4340 Floyd RD, Austell, GA 30106.

4.7 **Defendant Whitener Management and Consulting, LLC** is a

Georgia Corporation located at 641 McCready Drive, Dallas, GA 30157.

4.8 **Defendant The Whitener Group, Inc.** is a Georgia Corporation located at 502 Industrial Way N, Dallas, GA 30132.

4.9 **Defendant Gaye M. Whitener** (G. Whitener) is assumed to be a resident of either Georgia or Maine and is believed to be the wife of M. Whitener and the mother of S. Whitener.

4.9.1 G. Whitener is a principal in the defendants as listed in 4.1

4.10 **Defendant Anna Marie Dickerson** (Dickerson) is a resident of Cobb County, GA., and a Realtor employed with Jenny Pruitt and Associates.

4.11 **Defendant Jim Alexander** (Alexander) is a Senior Vice President and Managing Broker of the Jenny Pruitt & Associates brokerage located at 5290 Roswell Rd, NE, Atlanta GA 30342.

4.12 **Defendant Helen Lynch** (Lynch) is a Senior Vice President and Managing Broker of the brokerage as listed in 4.11.

4.13 **Defendant Jenny Pruitt & Associates, Inc.** (Jenny Pruitt) is a Georgia Corporation located at 990 Hammond Drive NE, Atlanta GA 30328.

4.14 **Defendant Home Services of America, Inc.** (Home Services) is a Delaware Corporation located at 6800 France Avenue South Suite 710, Edina, Minnesota 55435, and is the parent company of Jenny Pruitt & Associates, Inc.

4.15 **Defendant Berkshire Hathaway, Inc.** (Berkshire) is a Nebraska corporation located at 3555 Farnam St. NE, Suite 1440, Omaha, NE 68131, and is the parent company of Home Services.

4.16 **Defendant RE/MAX Greater Atlanta Commercial, LLC** (Remax) is a Georgia corporation located at 5600 Roswell Rd NE, Ste E 275, Atlanta, GA 30342.

4.17 **Defendant REMAX of Georgia** is located at 12600 Deerfield Parkway, Suite 125, Alpharetta, GA 30004

4.18 **Defendant Remax International, Inc.** is located at 8390 E Crescent Pkwy, STE 600, Greenwood Village, CO 80111.

4.19 **Defendant David Thomas** (Thomas) is an owner/Manager/broker with Remax as listed in 4.16.

4.20 **Defendant Lee A. Finch** (Finch) is an owner/manager/broker with REmax as listed in 4.16.

4.21 **Defendant Elaine E. Hayes** (Hayes) is an Associate with Remax.

4.22 **Defendant Sams, Larkin & Huff, LLP** (Sams Larkin) is a Georgia partnership located at Suite 100, 376 Powder Springs St., Marietta, GA 30064.

4.23 **Defendant Garvis L. Sams, Jr.** (Sams) is a partner in Sams Larkin.

4.24 **Defendant Joel L. Larkin** (Larkin) is a partner in Sams Larkin.

4.25 **Defendant Parks F. Huff** (Huff) is a partner in Sams Larkin.

4.26 **Defendant Richard A. Harrah** (Harrah) is a partner in Sams Larkin.

4.27 **Defendant Michael P. Pryor** (Pryor) is a partner in Sams Larkin.

4.28 **Defendant Weissman, Nowack, Curry & Wilco, PC** (Weissman Nowack) is a Georgia Corporation located at One Alliance Center, 4th Floor, 3500 Lenox Road, Atlanta, GA 30326.

4.29 **Defendant Scott A. Johnson** (Johnson) is an attorney with Weissman Nowack.

4.30 **Defendant Darryl R. Moss** (Moss) is an attorney with Weissman Nowack.

4.31 **Defendant Seth Weissman (Weissman) is a partner with Weissman, Nowack.**

4.32 **Defendant Christina Kearney** (Kearney) is an attorney with Weissman Nowack.

4.33 **Defendant Erin Chen** (Chen) is an employee of Weissman Nowack.

4.34 **Defendant Jane Hedgepeth** (Hedgepeth) is an attorney with Weissman Nowack.

4.35 **Defendant Quiona Blanks** (Blanks) is an employee of Weissman Nowack.

4.36 **Defendant Leigh M. Wilco** (Wilco) is an attorney with Weissman Nowack.

4.37 **Defendant Linda Bryant Curry** (Curry) is an attorney with Weissman Nowack.

4.38 **Defendant George E. Nowack, Jr.** Is an attorney with Weissman Nowack.

4.39 **Defendant Cochran, Camp & Snipes, LLC** (Cochran Camp) is a Georgia Corporation located at 2950 Atlanta Rd, Smyrna, GA 30080.

4.40 **Defendant Scott A. Cochran** (S Cochran) is an attorney with Cochran Camp.

4.41 **Defendant J. Al Cochran** is a partner with Cochran Camp.

4.42 **Defendant H. G. Snipes** (Snipes) is a partner with Cochran Camp.

4.43 **Defendant J Doe 1**(Doe 1) is an unknown individual/entity associated with Hayes, as listed in 1.16.3.

5. **Causes of Action**

5.1 Due to its inherently complex and voluminous nature and in the interest of time as outlined above, this filing has been limited to the briefest possible description of the causes of action, and the defendants included in the causes.

5.1.1 As they are prepared and prior to service, Plaintiff will file

supplemental briefs in support of each cause of action, showing the facts as relative to Plaintiff, which will provide greater detail as to the exact involvement of each defendant in each cause of action, and re-creation of the time line.

5.1.2 These supplemental filings will be accompanied by all necessary supporting exhibits, including but not limited to pertinent contracts, notices, invoices, telephone conversation transcripts, etc., all entered as per the proper time line of their individual occurrence and referencing.

5.2 There are **multiple**, overlapping **causes of action,** and **innumerable counts** that make up this **complaint**. There are **multiple predicate acts** involving all the defendants individually (and in some causes **collectively and conspiratorially**) which all contribute to an **umbrella "Racketeering Enterprise"**.

5.2.1 Through the prosecution of this complaint, Plaintiff fully expects information to surface that will prove the relative, **actionable conduct** of one or more of the **Racketeering Enterprises** to be so widespread as to require being elevated to **class action** status, resulting in the need to create **actions separate from this complaint**, in order to address the needs of the applicable class(es).

5.2.2 It is likely at least two "stand alone" Racketeering Enterprises (the Whiteners with their corporate entities as one and the Remax International

Network as another) in and of their own right may ultimately be considered separately. Their **actionable conduct** has provided more than enough **predicate acts** that are the result of their functions as the **individual enterprises** that they are **(in addition to** their contributions and association with the all encompassing, **umbrella Racketeering Enterprise**).

5.2.3 These and/or other possible similar enterprises will not be sub-catabolized in this matter due to complexity, but Plaintiff feels it will likely be necessary to **compile the records** of such enterprises **separately** at a later date, for the benefit of **future class action** conversions.

5.2.4 All **predicate acts** by Defendants will affect Plaintiff, but this may not be true with members of **separate,** particular **classes.**

5.2.5 As example, the **actionable conduct** shown in this complaint of **Remax** as it relates to how they treat their clients will also relate to a **class** formed from all their **past and present clients**, but their **actionable conduct** relative to **interfering** with Cunningham's **business relations** may not, giving rise to the need for separation.

5.2.6 The same may hold true for the **actionable conduct** of say, Sams, Larkin and Huff, in relation to how they **treat their clients**. While this firms **fraudulent, actionable conduct** designed to **interfere** with Cunningham's

**contracts** and **business relations** (and **steal** his **money**) are **predicate acts relative** to this complaint, it may not be so in another instance where the **class** is comprised of those the **firm** is *only* **fraudulently converting** clients' money **without providing** any **service** to the clients.

### 5.3 FIRST CAUSE OF ACTION

**RICO (Racketeer Influenced and Corrupt Organizations) Act. O.C.G.A. 16-14-1, *et seq.***

**Defendants numbers 4.1 - 4.43.**

### 5.4 SECOND CAUSE OF ACTION

**Conspiracy to Violate Georgia RICO - O.C.G.A. 16-14-4.**

**Defendants numbers 4.1 - 4.43.**

### 5.5 THIRD CAUSE OF ACTION

**Aiding and Abetting Georgia RICO - O.C.G.A. 16-14-4, 18 U.S.C. 1962**

**Defendants 4.1 - 4.43.**

### 5.6 FOURTH CAUSE OF ACTION

**Attempt and Conspiracy - 18 U.S.C. Section 1349**

**Defendants numbers 4.1 - 4.43.**

### 5.7 FIFTH CAUSE OF ACTION

**Mail Fraud - 18 U.S.C. Section 1341**

**Defendants numbers 4.10 - 4.15, 4.22 - 4.31, 4.37 - 4.38**

**5.8 SIXTH CAUSE OF ACTION**

**Bank Fraud - 18 U.S.C. Section 1344**

**Defendants numbers 4.1 - 4.15, 4.22 - 4.38.**

**5.9 SEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress - O.C.G.A.**

**Defendants numbers 4.1 - 4.43.**

**5.10 EIGHTH CAUSE OF ACTION**

**Defamation - O.C.G.A. 51-5-4**

**Defendants numbers 4.1 - 4.21.**

**5.11 NINTH CAUSE OF ACTION**

**Tortious Interference With a Contract - O.C.G.A. 51-12-30**

**Defendants 4.1 - 4.43.**

**5.12 TENTH CAUSE OF ACTION**

**Tortious Interference With Business Relations - O.C.G.A. 51-12-30**

**Defendants 4.1 - 4.43.**

**5.13 ELEVENTH CAUSE OF ACTION**

**Fraudulent Misrepresentation - O.C.G.A. 51-6-2**

**Defendants numbers 4.1 - 4.43**

**5.14 TWELFTH CAUSE OF ACTION**

**Deceptive Trade Practices - O.C.G.A. 10-1-372**

**Defendants 4.1 - 4.43.**

**5.15 THIRTEENTH CAUSE OF ACTION**

**Violation of Georgia Real Estate License Law - O.C.G.A 43-40 and Rules and Regulations - Chapter 520.1Regulation 520-1-.08**

**Defendants 4.16 - 4.21.**

**5.16 FOURTEENTH CAUSE OF ACTION**

**Violation of GA Real Estate License Law - O.C.G.A. 43-40 Chapter 520-1-.17**

**Defendants 4.16 - 4.21.**

**5.17 FIFTEENTH CAUSE OF ACTION**

**Professional Malpractice - O.C.G.A. 9-11-9.1**

**Defendants**

**6. Summary**

6.1 Plaintiff is interested in purchasing property and developing a project on the property, but this is apparently not going to be tolerated.

6.2 Plaintiff's basic project is estimated in total cost at between $70,000,000 and $90,000,000 depending on final plan approved. Plaintiff sits by, unable to move forward with his project, due to the actionable conduct of

Defendants.

6.3 Plaintiff had submitted his Pro Forma to his Lender and received tentative approval on funding for his project a short time after formalizing the contract with the Whiteners.

6.4 More than six months later, Plaintiff was still waiting on Defendants to perform, when he received an email from his lender. The lender is understandably curious why Cunningham has not come back with the final request for funding; it's not common to leave $90,000,000 that has been all but guaranteed, laying on the table. The tone of the communication implied they did not wish to be pushy, but were trying to determine if Cunningham had found funding elsewhere.

"...We do not remember where we got sidetracked...or what may have happened to the deal, but the purpose of this note is to confirm our interest in assisting you in your efforts to finance the project if in fact you are still seeking financing. We liked the preliminary information we saw and would appreciate the opportunity to review where you are now and provide you with a potential loan structure for your review, should you have an interest..."

6.5 Plaintiff has done all he can and more to move this deal forward, meeting resistance at every turn, by every Defendant listed (and likely others) herein.

6.6 It appears that, prior to signing the deal, there were those who had other plans for the property, and when Cunningham signed the deal, their plans were ruined.

6.7 The Sellers stopped cooperating with Cunningham quite literally as soon as the ink on the contract had dried. Signing the agreement was the last act in support of the agreement they have taken (and only close to a year later did they decide to try and find fault with the contract).

6.8 Remax, the real estate firm Cunningham hired to help him with the contract and purchasing contiguous properties, started by trying to sabotage the contract with the Whiteners; kept Cunningham away from the contiguous properties he also wanted to buy (and that Remax had signed an agreement to help him purchase); lied to other individuals to cause Cunningham to lose contracts he had on properties and even defamed Cunningham in the neighborhood he was trying to do business in; Remax had purchase contracts for the properties they were trying to steal out from under Cunningham, so there is obviously another outside (J Doe 1) entity, likely the driving force and the entity that felt Cunningham had no right to purchase property it was interested in, from the beginning. Cunningham waits with great anticipation to discover who/what this entity is. The firm's broker even interfered with Cunningham's attempts to file complaints against their listing agent.

6.9 The Seller's real estate firm, Jenny Pruitt, ran interference, helping to keep Cunningham from contacting them.

6.10 The Seller's attorney (well, we *think* he's their attorney) lied about representing them, and misrepresented himself while citing Smyrna City Ordinances, and also helped run interference, to keep Cunningham from contacting them.

6.11 Cunningham hired Sams, Larkin & Huff to help him with the purchases and re-zoning process on these as well as other properties Cunningham already holds, and to assume those responsibilities that had been Remax's.

6.12 The firm did everything it could to delay and keep Cunningham from consummating the deal. They took his money but refused to answer zoning and other questions he paid for; delayed meetings with the City; tried to dissuade Cunningham from pursuing his project by demeaning it's general qualities; basically whatever they could to keep Cunningham from being able to buy the property, even lying about who owned a particular contiguous property Cunningham was interested in.

6.13 After firing Sams Larkin Cunningham hired Weissman Nowack to take *their* place, and to assume the responsibilities that had been theirs and Remax's. Weissman Nowack, keeping in step with those before them, did everything they could to keep Cunningham from being able to buy the property.

They tried to convince Cunningham his contract was faulty, then changed their minds and took his money, then *re-decided* it was faulty; they hid the fact that they represented Jenny Pruitt, the Seller's real estate agent; they tried to convince Cunningham to abandon his contract, *even when* the Sellers and their attorney *were offering no challenges* to the contract, rather, they (and their attorney) were apologizing for their non-performance; similar to the Sellers, they even refused communication from Cunningham, then told him they couldn't represent him because *he* wouldn't communicate with *them* (skipping completely over the part about it being due to the conflict with their representing Jenny Pruitt).

6.14 As far fetched as it must seem [Plaintiff stands back, looking at this in total amazement at the thought of all these people working their various little (sometimes big) parts, in concert, with the common goal of *nothing* but getting Cunningham out of this deal so that the "right" person/entity can have it], each of these entities and individuals has done all and more to Cunningham, than is set forth in this complaint.

6.15 All Cunningham has tried to do is develop a project. He's done every thing by the book, tried to hire all the best people to help him do it right, and has had each and every one of them try to walk him out of the deal (and relieve him of his money and emotional well being as well).

6.16 Now Cunningham sits and reads emails from lenders (wanting to know when he's going to pick up his $90,000,000), as he tries to decide just how in the hell he can find an attorney he can trust and also qualified to prosecute this multi-faceted complaint with competence.

6.17 BE IT KNOWN, Plaintiff is not at all desirous of proceeding with this complaint *pro se*, but will do so, need be, and until such time as he can retain counsel.

6.18 Plaintiff further begs the Court's patience and indulgence, as he diligently efforts to retain honest, professional counsel to help him move forward as quickly as possible with this endeavor.

## 7. Request for Relief

WHEREFORE, James D. Cunningham requests relief and judgement against all Defendants, jointly and severally, unless otherwise stated. The relief is requested to cure the damages sustained as indicated in this complaint and the punitive damages requested are to deter similar conduct of Defendants in the future and for other reasons provided by law.

The requested relief is further identified as follows.

7.1 An award of damages against the Defendants estimated to be $150,000,000, with the exact amount to be determined at trial, which includes

compensatory damages and punitive damages, together with attorney's fees, cost and litigation expenses in the maximum amount allowed by law, which includes three-fold the damages, as applicable, that James D. Cunningham sustained, together with both pre-judgement and post-judgement interest as provided by law, in all the causes of action.

7.2 The Court should grant such other and further relief as justice may require, including but not limited to ordering Defendants party to the existing Purchase and Sale Agreement to perform as required by the agreement.

**JURY DEMAND**

James D. Cunningham demands a jury trial by twelve persons as to all matters triable by a jury as the damages sought exceed $100,000.

Respectively submitted,

James D. Cunningham
PO Box 878
Smyrna, GA 30081-0878
770-434-3503
770-434-3503 fax
Pro se litigant